Our next case today, number 231692, United States v. Sixto Jorge Diaz-Colon. Will counsel for our appellant please come up and introduce yourself on the record to begin. Good morning, Your Honor. Attorney Rafael Castrolan, representing Appellant Sixto Jorge Diaz-Colon. Before I begin, I would like to express my sincere condolences for the death of Judge Selda, whom I personally knew and was an excellent judge. And I also request that you allow me three minutes for rebuttal in this case. Okay, I approve both of your remarks. But we appreciate the sentiments. You may begin. Yes, this case presents a wrongful conviction based on a legally and factually impossible theory of attempted extortion and obstruction of justice. Your Honor, let's begin with the alleged message that was sent on June 20th. I'm sure you have read that message that Sixto sent to Mr. Maceda. And all that message reveals is that Sixto, who was of the same party as Maceda Just because we don't have a huge amount of time, we're pretty conversant with We don't have a large amount of time and we have a lot of issues and we're conversant with the record. So the testimony then, though, was given that augments an account of what was said by your client. I'm talking about the text message. I understand, but then there was testimony as to what was said after that text message, right? Well, yes, Your Honor, again And I might add a recording as well, counsel. Excuse me? A recording that also memorializes Yes, Your Honor, I'll go into that then. Your Honor, the July 16 recording can never support an extortion case. First, by July 16th, on July 8th and 13th, over a thousand chats had already been released. The damage was already caused, Your Honor. The majority of the Procedure's cabinet had resigned, about 10. Procedure shortly thereafter resigned also. So there was no quid pro quo left. The damage was done. The threat was carried out without obtaining payment. Counsel, there's a question. Wasn't there some uncertainty as to whether there were more texts that were yet to be released? Well, there's a statement to that effect, but the record doesn't reveal any additional texts. Huh? I thought your client The government had access to Sixto's cell phone. The government had access to Rowley's cell phone. Rowley was even a witness for the government. The government had access to Maceda's cell phone. Yeah. There were no additional texts to be revealed. Had there been some, Rowley would have released them to the press. But was there testimony that there was no more texts to be released? Well, there was Did Rowley say that all of the texts that were in existence had already been released? There's a conversation where Sixto mentions that there were additional texts. But that, even though they had all of the allegedly persons involved, was never established. That was a false claim. This whole case, Your Honor, is a bluff. It's a bluff. Let's begin with the But, Counsel, you say it's a bluff. Yes. It was taken very, very seriously by Mr. Macera. I mean, you say that perhaps in the mind of your client it was a bluff, but that's not how it was perceived. Can I explain myself, Your Honor? Of course. To begin with, in order to aid and abet someone, there has to be a principle. In this case, there is no principle, because Rowley, who went to the grand jury, was available and announced as a witness for the government, never claimed that he had asked Sixto for $300,000. And, in fact, when the recorded conversation of July 26th was made by Sixto at the request of Agent Lopez and the two other FBI agents that were there, Rowley did not say, oh, I've already told you I didn't want money. Oh, yes, I want money. No, he said this had never been about money. It's about revenge. But the government takes the view that your client was the principle, right? At least that's one theory of their case. Who else? He couldn't engage in a crime with Macera, who was a government informant. The government never participates in a crime, Your Honor. Macera could not count. Rowley couldn't count either, because there was no evidence. Sixto talked about Rowley wanting $300,000, but it never went beyond that, Your Honor. In fact, I want to emphasize the July 16 recording, because, Your Honor, at page 96 of the appendix, Sixto tells Macera, the only way you are $300,000. And I said, Rowley, that is not going to happen. Rowley, that is not going to happen. I am not going to do that. That is called extortion. I am not going to do that. I didn't call you both. Then at page 143, again, Sixto tells Macera, I know that he is calling me to see what has happened, to see if I talk to you guys in that kind of movie. You understand? But I told him from the get-go. I told him from the get-go. I wasn't going to do that. Sure, the jury heard that disclaimer, but they also heard a lot more from Macera about the full conversation. So isn't that a classic jury issue, whether that disclaimer absolves your client of any? In light of the additional testimony. I mean, it would be one thing if the only thing in the record was the text message and the recording you just read. But what we have is the text message, the recording you just read, and then Macera's testimony about what else was said by your client, correct? Well, Your Honor, there's no doubt in the conversation which occurred at the request of Macera. You don't have a single text, a single card originated by Sixto asking Macera, give me the $300,000. Counsel, we have the testimony of Macera saying that was said, though, correct? Yes, and let me say something on that matter. Because this is one case where the court should refrain from coming forth with the rule that credibility matters solely for the jury, and the jury determined that he had done that. That's a general rule. But here we have the problem. Counsel, try to introduce the July 26th conversation. Go back to your microphone. Counsel, try to introduce the July 26th conversation. Counsel, try to introduce the June 21st conversation. Counsel repeatedly tried to cross-examine Macera concerning relevant matters that demonstrated he was not a credible person. And I was denied all those opportunities. Now, the court has to look at those excluded pieces and then see if you, looking at this, come to the conclusion that that was harmless, it wasn't harmless. Now you're moving to trial error as opposed to sufficiency. But on the trial error claim, can I just ask you about the jury instruction? I think it says to count to. Count to fails. But let me ask my question.  Okay. There was a jury instruction about threat. Is that to count to? Yes. And that jury instruction did not include the requirement that the threat be wrongful. Is that right? Well, for a violation of that statute, Your Honor, it says that the communication has to request an extortion, a demand of extortion. That should have gone in Rule 29 because that was politically protected speech. I want to ask you about your jury instruction challenge. Yes. Aren't you challenging the jury instruction on count to?  You are, right? You are. We objected to the jury instruction. And the reason you objected was because it did not include the modifier that the threat had to be wrongful, correct? Yes. Okay. The government says that is harmless error because count one had a similar instruction that included the wrongfulness requirement and the jury convicted. What's your answer to that response to the contention that the count to instruction was erroneous and therefore requires us to vacate that conviction? Again, count to is based on the text message. The text message was a political message. Count to is based solely on the text message? Count to is based solely on the text message? Well, that's what it's based on. Solely? Well, the government argues that the other incidents established the violation. The problem is that whatever may have been said on other occasions, that was never implied or informed when the message was sent. Okay. Assuming that the count to conviction, that there's sufficient evidence for the count to conviction, I'm asking you about the harmless error aspect of your jury challenge on count to. Because it seems to me you're correct that the jury instruction leaves out the word wrongful on count to. So I'm trying to get your answer as to the government's response as to why that's harmless error. Well, Your Honor, it's not harmless because, Your Honor, they had to inform the jury the elements of count to. Okay. And to begin with, there's no underlying crime for aiding and abetting here because that statute does not include as a crime an attempt. That's to begin with. An attempt is no aiding and abetting in count to. So that was totally improper. And the case will request that the initial message has to. He did nothing. Counsel, Judge, Judge Lepez has a question. With respect to count to, there was no instruction on the theory of attempt. The theory of attempt was limited to count one, the extortion count. Isn't that correct? I understood the government to argue that counts two and three do not, they did not press any attempt theory with respect to counts two and three. Do you disagree with that? Well, Your Honor, but there has to be intent. Attempt. There has to be intent. Attempt. Attempt. Well, the government came with, in my opinion, the ridiculous argument that he committed the substance of crime of attempt. Attempt is not a substance of crime. And for it to be charged in a statute, the statute has to expressly prohibit the attempt, include the attempt, just like the experience includes attempt. Count two doesn't. Thank you. You reserve three minutes. Yes. Okay, Your Honor. Is that right? Three minutes? Obviously, Your Honor, it's impossible to discuss all five issues, but I think my briefs are pretty accurate. Thank you. After the sequence of events. Counsel for Zappoli, please introduce yourself on the record to begin. Good morning, and may it please the Court. John Alex Romano on behalf of the United States of Zappoli. The evidence amply proved guilt on each count of conviction, and Mr. D'Escolone has not shown reversible error as to any ruling challenged on appeal. I'd like to begin first by addressing the sufficiency of the count one evidence on attempted extortion, and then move to the jury instruction questions that began with your question, Chief Judge Barron. On the count one evidence, the evidence here at trial proved. On the attempted extortion, you've got the June 20th text or telegram, whatever it is, and then it jumps to July. Is there something that happened in between? Yes, actually quite a bit happens in between. So you have the, it starts with the June 20th threatening telegram message. The next day, there's the first of two meetings. Would you consider that alone threatening? We do, Your Honor. On its face, it is very threatening, and we think, although there's plenty more evidence of a substantial step, which is really one of the main challenges made to the count one evidence. You're saying that if this is all that you had, you could, that would be enough to charge him with extortion? Or attempted extortion? Just the telegram. If that was all the evidence, I think it would be difficult to show the intent to extort, because the extortionist demand comes only the next day. That's when the first iteration of it comes. There's a meeting during lunch at the Moussa restaurant, the first of two meetings, the second of which occurs July 16th. But at the June 21st meeting at Moussa, Mr. de Escalon does two things. One, he sort of explains what this threat is that's been alluded to the prior day in that message. He explains principally that Maldonado Nieves has this trove of chat messages between officials that would be damaging if released. He also alludes to some evidence that Mr. Maldonado Nieves has of some unspecified conduct perhaps against Merceda. So he amps up what the threat is. When does the money part come in? And then at the same meeting, he makes three demands to make the threat go away. One is he says that Maldonado Nieves is requesting a payment of $300,000. De Escalon also asks for Merceda's assurance in getting two government contracts renewed. These are government contracts from which Mr. de Escalon was receiving a cut. Sorry, just on this narrow point, the sole—this doesn't mean it's insufficient, but the sole evidence of the statements about the money at that—is it June 21st? Correct. At the June 21st lunch come from Merceda himself. In terms of what was admitted at trial, that is correct, Your Honor. The government did not—there is a recording of the Moussa meeting. The June 21st Moussa meeting? Correct. But there's nothing on that recording that includes the monetary request that you're saying Merceda said the defendant made to him. I'd have to go back and check it. We didn't admit it at trial, and it was not admitted. There may have been a reference— There's nothing in the record other than Merceda's testimony about what was said. The recording itself that was admitted doesn't show that. Just one caveat. It doesn't show the 300—the request for $300,000, but it's an incomplete recording. It may, in fact, reference the government contract assistance. I'm just not recalling as I stand here right now whether that incomplete recording of the June 21st meeting captures the discussion of the contracts. Counsel, I'd like to be clear on the government's theory of the prosecution with respect to Count 1. It appears that the government had two theories. One was that Mr. Diaz-Colón was pursuing extortion for his own benefit. He was the principal, and he had his own reasons and his own interest in the extortion. Or this is the aiding and abetting theory, that he was doing it on behalf of Raleigh. I gather it's your position that the indictment allowed the government to pursue both theories, and, in fact, you did at trial. And I gather, since the jury was instructed both on principal liability and aiding and abetting liability, that the jury, in some unspecified way, could adopt both of those theories and put them together, and that would be okay? Is that your theory of the prosecution? The jury would have to be unanimous on its theory. We have made the argument— Oh, really? But wasn't there a request that the jury be told that they had to be unanimous on a theory? And that was— Perhaps I misspoke in saying our argument is that a general unanimity instruction would be sufficient under all the cases. I believe they're cited on page 108 of the government's brief. A general unanimity instruction would be sufficient when there were two distinct theories of criminal liability put before the jury? I don't believe this Court has addressed the issue, but the cases, and I believe it's at least four or five circuits, have rejected the argument that a specific unanimity instruction is required on aiding and abetting liability. And the reasoning being, I think this might come out in, I think, Garcia's case is one of the cases we cite. It's that aiding and abetting is an alternative means for committing a single offense. Like a brute fact. And so that's why— It's just like a brute fact that they can have different theories of the— Correct. Yes, so I apologize if I had misspoken initially in response to your question. We haven't passed on that, so— That's correct. But was there a request for a specific instruction as to unanimity, as to the theory of aiding and abetting versus not aiding and abetting? I believe there may have been, Your Honor. I don't know that that issue is on plain error review. In terms of asking for a—whether—your question was whether the defense made a specific request for a special unanimity instruction on aiding and abetting. And did they raise that on appeal, that if there was such an instruction, it was rejected? I don't think they did, but maybe they did. I may be misremembering, Your Honor. You don't— I apologize. What are you remembering? I'm not remembering that we made a plain error argument. With the Court's indulgence, I can check something very quickly. Well, we can check. But they did—you understand that issue to be on appeal, whether that—the requested instruction was rejected? I believe it was raised in passing. We certainly briefed it, Your Honor. So it is an issue, I think, that is implicated in the many issues that are raised on appeal by Mr. DiEscalone. And just to understand on the count, there was a reference to you—well, is it clear that you can't have extortion if the purpose of the extortion is to have the money go to a third party? No. This Court held in Brissett that— That's what I thought. —obtaining a property— I think I wrote Brissett. So, yes. That's correct. But if that's right, why would it be the case here that you could only understand it to be an aiding and abetting theory insofar as the threat, if made, would have resulted in Rowley getting the money? Right. Rowley getting the money wouldn't require us only to be in the world of aiding and abetting. You could still be the principal. Correct. Even if the way you're extorting somebody is to give money to a friend. That's correct. That's correct. I think the government's argument on aiding and abetting liability is that the jury could conceivably view Mr. Maldonado-Nieves as a principal based on what DiEscalone is saying. Did the government argue that he was a principal even with respect to the money going to Rowley? I believe it did, Your Honor. The government's theory, I think it's fair if the court were to review the closing argument and the rebuttal, that was that Mr. DiEscalone was the prime mover. And, you know, that's why in rebuttal, while the closing argument focused on the demand for $300,000, in rebuttal, that's where the government mentions the government contract, right? Because DiEscalone is not only asking for the $300,000 purportedly on behalf of Maldonado-Nieves, but he's asking for government-of-contract assistance. These are contracts from which he says on the Il Postino recording on July 16th, he's getting a cut from. If my colleagues have further questions on the sufficiency of that, I'll hold off on this. On the jury instruction as to Count II, in Brissett, I think there was quite a significant discussion at the end about the wrongfulness prong. There's no mention of wrongfulness in the Count II instruction, correct? That is correct. So, is there some way in which that wasn't error? Or is your argument just a harmlessness argument? Argument is just a harmlessness argument. Okay. And then with respect to harmlessness, what is the reason why it's harmless? As I understand it, the only evidence directly supporting that count, so in other words, if I look at the text message, it doesn't on its own, that first text message support it. The recording, unless it's mentioning in some direct way the contracts, wouldn't on its own support it. But the Maceda testimony is quite damaging. But for purposes of harmless error, it seems a little odd to think that the Maceda testimony alone is so obviously indisputably credible that it couldn't possibly be harmful to have omitted that instruction. So, I'm not following the government's harmlessness argument. I appreciate the court's question. And I think part of it comes from the fact that wrongfulness in the context of extortion by trying to induce a fear of economic harm, wrongfulness has a particular meaning, right? You know, the threat is harmful – is wrongful. Let me just be – what's worrisome is that the first text message might be understood colloquially as a threat, but I think it's just Thompson's questions we're getting at. You couldn't read that in any clear way as a threat that would constitute extortion. Certain threats that I make to my children and others are not extortionate threats. So, the problem with an instruction that just says all you have to do is find it's a threat is that for all we know, the jury thought that meant the text message alone was enough. I don't think so, Your Honor. And if I can just back up because this sort of – Your Honor's question touches on an argument about the statute that my opponent makes, which is that in order to violate 875D, the extortionist demand, the intent to extort, has to be seen in the communication that's sent in interstate commerce. And that's – okay. That's not what I'm saying. Okay. It does not – I'm not saying that. Right. But the only thing that is providing the basis for concluding that there was such a threat – in fact, this is the – I think that point reinforces the concern that I'm trying to get you to address because it just highlights that the evidence that supports it then is Mercedes testimony. But that kind of testimony we usually don't treat as so strong that it alleviates any concern with an error in the instruction. Right. But the omitted element, a threat is wrongful if the property that is trying to be extorted, the person has no plausible claim of right to the property. So the court has to look to the evidence to look to what the intent to extort was. We don't know there was any demand for property. What's the basis for thinking there was a demand for property other than Mercedes testimony? The recording of the Il Postino transcript meeting, which has references – yes. Now it clearly does have references. What, to the contract? When I was speaking, I was speaking to the June 21st recording. Now I'm speaking about the July 16th recording. And what is in the July 16th recording? It refers – there's references all over. Is that – that's the language that the counsel just read from the bench? Is that what you're talking about, where he says Rowley wants $300,000 and I told him absolutely not? Right, and that – That's supposed to be the thing that's the overwhelming evidence of the extortion. We also have to look at the fact that he's making a demand for two contracts, from which he says on the recording, I'm getting a cut of these. You have to look at the other demands for payments that he's making on this recording. That's in the Il Postino test and that's in the Il Postino recording? Yes, that's also the government contracts. I would point the court to, I think, pages 80 to 105 is a very good portion in the supplemental appendix of the recording. The court can also look at the end at, I think, 118 to 120 to 21 of the supplemental appendix, where Mr. Maceda effectively has Mr. Diaz-Colón confirm that he's making three demands for money, $300,000, government contract assistance, and these payments, monetary payments, one of which was $50,000 to media influencers. On that recording, is the Il Postino recording? Correct. On that recording, what does the defendant say to Maceda that shows he is saying, I want money? I don't have the exact language here, Your Honor, but there are a couple of references to the government contracts, and he does indicate that he gets a retainer from them. And, again, it is summarized at the end, 118 to 120, and I don't think, even if we're in harmless air land, that we can't consider Maceda's testimony as well that Mr. Diaz-Colón was both acting as sort of trying to light the fire and trying to come and be the firefighter. I don't think that cuts against or is precluded from a consideration when we're doing a neater analysis. And when we look at what the element was that was omitted, whether or not there was a plausible claim of right to this property, and it was undisputed at trial. Mr. Diaz-Colón never claimed at trial that Maldonado Nieves had a right to the $300,000 or that there was a right to get these contracts renewed. So that was undisputed. Even on this Il Postino recording at page 60 of the supplemental appendix, Diaz-Colón says, I told Diaz-Colón that the instruction at least required them to know there was a demand for property.  And so then the only thing that was omitted was whether it was a wrongful demand for property. That's correct. So they couldn't have been relying just on the text message or anything else. They had to be relying on some evidence that showed there was a demand for property at least. And then you're saying it's just no way, if he was asking for that property, he had any right to it. That's correct. All reinforced by the finding on count one where there was a wrongfulness instruction. Council, before you sit down, I would like to ask you about the claim that there was government misconduct. This is really with respect to the recording of the conversation at Moussa. And the government, as part of its discovery obligations, turned over that recording and in doing so characterized it as inaudible. That turned out to be inaccurate. There was testimony at trial that it was audible. And in fact, it turned out that there were portions of the conversation that were audible. Is it your position that just having turned it over? This does seem to be the district court's view, having turned it over to defense counsel, it was the obligation of the defendant to determine if that characterization that was inaudible was correct. So the government, there is no responsibility for that clearly wrong characterization. It's obviously a very important recording. Government bears no responsibility for that flatly inaccurate characterization of the tape? Not in the context of Brady, Your Honor. And I know the court is familiar with the fact that we did turn this over 19 months before trial. So there was ample time, and I'm sure the defense listened to the recording for itself. I don't know. I have to go back and look at the e-mail because this is at, I think, pages 834 and 836 of the sealed supplemental appendix, the e-mail communications between the government and opposing counsel about the recording. I don't know that we flat out said inaudible as opposed to referring to, you know, we did not get it transcribed. Well, you did not get it transcribed because it was inaudible. That's what you told them. Whether we said inaudible or audibility problems, I won't fight on that distinction. Mr. Macedo did testify that, you know, parts of it were inaudible. So I don't know that it was at all a big secret. And certainly by providing it to, in discovery, 19 months before trial, we believe that there was no, under the first prong of Brady, no suppression here by the government of information, no misleading, at any point the defense could have listened to the recording. And, in fact, closer to trial when there was follow-up and a request for clarification by the defense as to, well, is there an enhancement or when can I come hear the recording, we offered to allow the defense to come hear the recording if it wanted to do so. So there's no, I don't believe the record bears evidence of any sort of intentional misstatement to the court that might find fault with our characterization of the recording as inaudible. And I don't think the case law requires us, the government, to take any measures as to enhancing the recording, doing transcripts when we turn it over to the defense. By the time the July meeting came around, was there evidence that there were still more text messages out there that could be the basis for extortion? Not that I'm aware of in the record, Your Honor. I don't believe there was any evidence of that in trial, except for the fact that on the recording of the Il Postino meeting, Diaz-Clone is making reference to the fact that there may be more messages, right? He's trying to amplify, he's trying to make sure that this threat still exists, or so the jury reasonably could find, by saying, you know, Maldonado Nieves is acting out of control. He uses some colorful language that I won't repeat here. He's acting like the famous Corleone mafia. And in that discussion, there's an allusion to the fact that there well may be additional damaging text messages that don't come out if Maceda and the administration don't pay the $300,000, don't help with government contracts, don't pay all these media influencers whose message Mr. Diaz-Clone controls. Finally, counsel, I mean, I can anticipate your answer. You will say this is about count three, the obstruction of justice based on the destruction of evidence. It's one of the most implausible accounts I have ever heard in the sense that the destruction of evidence is taking place actually in front of the government agents who are sitting there interviewing the defendant. They allow him to keep his phone. And while I take the points, I think I would agree that the reasonable course for law enforcement officers would have been to either take possession of the phone before they conduct the interview or to somehow impose other controls on it. So I certainly understand where Your Honor's questions are coming from. But how do they know what got deleted? That is identified through the testimony of Maceda in an exhibit that gets admitted at trial. Maceda testifies that during that day, he sees these banner messages about incoming telegram messages, doesn't get a chance to read them until later that night. And when he goes to read them, they're gone. How did they disappear from his phone? Is this an app that makes it disappear? It is. It's a function of the telegram messaging app. Some of that background testimony comes in. I think it's discussed in the early part of our statement of facts about how telegram operates. But one benefit is that it does allow the sender to have some control over when it can be viewed and being able to delete the message as well. And then so Maceda sends this screenshot of this empty folder of his messages with Diaz-Colón. It's timestamped 8-0-9. And at the top, it says Diaz-Colón was last seen on telegram about four hours ago, which places that in the window of when the FBI was there. And then Maceda also identifies some of the messages that were deleted. But how are we supposed to conclude the content of the messages? Mr. Maceda does. He's shown, for example, Government Exhibit 9, which contains some telegram messages between Diaz-Colón and Maceda on July 16th to July 19th. And he says, yes, those were among the messages that were in my message inbox on telegram with Diaz-Colón. Those messages were among the ones that were deleted. So in that testimony- I'm sorry, so he had screenshotted the messages? He had previously-Maceda was by then working as a confidential source for the FBI. So before July 26th, I think the fair image is that he's already provided a copy of the July 16th and July 19th messages to the FBI, but they're still in his folder. And then on July 26th, the FBI interview happens. There's a sending of additional messages that day. Am I right that you're saying we don't know anything about the content of the messages, we just know who they were to and who they were from and the period of time in which they were sent? No, we do know that the messages that-we don't know the content of the messages that were sent on July 26th, when Maceda says he sees some incoming messages but doesn't read them. But we do know that his inbox on that day still had the messages that were exchanged between himself and Diaz-Colón. The deleted messages, which ground the obstruction of justice count. Do we know anything about the content of those messages? Yes, we do. What do we know? They include the messages on July 16th when, while they're meeting at Mil Postino, Diaz-Colón sends the names of the companies that are to get these government contracts. One's called Collective Impact, the other's called Social Consulting. Emails with that information is what was deleted and we know that? Yes, Telegram messages, to be clear. Yes, because Maceda identifies them during his trial testimony. Yes, these were among the ones that were deleted. So we know they're incriminating. Once again, there's screenshots of those messages? No, they are-the court can look at them. I'm just holding it. It's Government Exhibit 9. It's-I don't know that it's a screenshot. It was provided because- Does it capture the content? Yes, it does. It does. Just give me an example of what one says that talks about what was being extorted. Sure. It says this would be on page 133 of the supplemental appendix. And this is-this occurs in real time during the meeting at Mil Postino. And if the court looks at the transcript, you'll see that Diaz-Colón says, yes, I'm going to send you the names of these companies right now. And then, sure enough, on page 133 of the supplemental appendix, you have the names of the two companies that get the contract, social consulting, collective impact. And then you have-and, you know, the messages before that are the lead up to sort of, you know, where are we going to meet? Let's meet here. Let's meet there. And then you also have a message on July 19th where Mr. Maceda reaches out and says, you know, thank you for the support. You know, I haven't forgotten about you. And then Mr. Diaz-Colón responds, you know, hitting hard, without fear, onwards and upwards. So a lot of these messages are incriminating. Certainly the jury reasonably can find them to be incriminating in those evidence, the intent to extort-excuse me, the intent to obstruct the investigation, which would be irrelevant to finding it would need to make on count three. Thank you. Thank you. Thank you, counsel. Attorney for Appellant, please come up and reintroduce yourself on the record. You have a three-minute rebuttal. Your Honor, as to count two, we submit that the conversations at El Postino and Musa Restaurant cannot support count two. Why? Because what count two prohibits is a message sent in interstate commerce and what was sent was the message, not the conversations of Musa and Postino. So there's no evidence that he sent extortion messages in interstate commerce. What he sent only was a message that conveyed a political concern. Second of all, Your Honor, it's really important that no extortion could have occurred here. Extortion requires the ability to deliver something of value in exchange of money. Colón had nothing to offer because he never controlled the chats, and only Raul Imaldonado possessed and leaked the chats. What you have here is not an extortionate request from Sixto. He conveyed an alleged extortionate request of Raul Imaldonado. Sixto was not the extortioner here. The alleged extortioner was Raul Imaldonado. So, Your Honor, Diaz-Colón really spoke with Merceda, a government informant, which cannot form the basis for aiding and abetting liability. Why isn't that aiding and abetting Raul? Could you speak a little louder? Why isn't that aiding and abetting Raul? Well, all you have is Sixto making a verbal representation of what Raul allegedly said. The July 26th conversations revealed that Raul never made an extortionate threat. He said clearly, I didn't want money. I wanted revenge. But, counsel, the government has this other theory of criminal liability, which is that your client was doing this for himself. I mean, they introduce evidence that he has an interest in getting these contracts from the government. He asks for money that would support the influencing radio and television show that he has. They introduce evidence that he has debt issues. He has financial issues. So they're clearly putting before the jury the theory that he was making these extortionate demands for his own benefit. I mean, that is, I know you objected to some of that evidence, for sure. But that evidence came in, and that is another theory of the case for the prosecution. The problem is that the indictment for the charge was that Raul wanted $300,000. If Diaz Colon wanted money for himself, why did Merceda refuse to take $20,000 to him, which would have established the crime? He, who was the principal instigator of this crime, when they gave him the opportunity to establish and complete the crime, he refused to do so. Yeah, and he explained that before the jury. He didn't think it would work, and he was uncomfortable doing that. He explained that, did he not? Well, Your Honor, again, I have problems with the credibility assessments in this case because we were not allowed to present our side of the story. And it would be a serious mistake to apply that rule in this case where the record is clear that material, substantial evidence was excluded by the judge that could have affected the verdict. Are you talking about the limitations on the cross-examination or something else specifically? Oh, yes, I specified them. Well, I tried with Lopez to have him authenticate the June 21st message. I tried to have the July 16th, the June 20th, 21st recording admitted, which was denied. There were five instances that I show in my brief that demonstrated that, let's say, that was a liar, and the judge always sustained the government's objections. So we were left bereft. What the trial record reveals only is their aversion. Ours was suppressed. It was an unfair trial, Your Honor. An unfair trial. Thank you. Thank you. Thank you, counsel. That concludes arguments in this case.